# In the United States Court of Federal Claims

### No. 08-599C
### (Filed: March 11, 2009)**
### **OPINION ORIGINALLY FILED UNDER SEAL ON FEBRUARY 27, 2009

| | |
|---|---|
| * * * * * * * * * * * * * * * * * *  * | |
| | * |
| **AL ANDALUS GENERAL** | * |
| **CONTRACTS CO.,** | * |
| | * **Bid Protest; Indefinite Delivery** |
| **Plaintiff,** | * **Indefinite Quantity ("IDIQ")** |
| | * **Contracts; Failure to Show Prejudice;** |
| **v.** | * **Past Performance Evaluations; Price** |
| | * **Reasonableness Determination;** |
| **THE UNITED STATES,** | * **Waiver of Minor Irregularities; 48** |
| | * **C.F.R. 52.215-1(f)(3)** |
| **Defendant.** | * |
| | * |
| * * * * * * * * * * * * * * * * * * | |

*David T. Ralston,* Washington, DC, for plaintiff. *Frank S. Murray*, Washington, DC, of counsel.

*Joseph A. Pixley,* U.S. Department of Justice, Washington, DC, with whom were *Gregory G. Katsas,* Assistant Attorney General, and Jeanne E. Davidson, for defendant. *Parag Rawal*, U.S. Corps of Engineers, Washington, DC, of counsel.

## O P I N I O N

**FIRESTONE**, *Judge.*

This post-award bid protest comes before the court on the parties' cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). Plaintiff Al Andalus General Contracts Co. ("Al Andalus"), an unsuccessful offeror, challenges five Indefinite Delivery Indefinite

Quantity ("IDIQ") awards made under a Multiple Award Task Order Contract ("MATOC") issued by the United States Army Corps of Engineers ("defendant," "USACE" or "the agency") for miscellaneous construction projects in and around Baghdad, Iraq.  Al Andalus seeks to enjoin USACE from issuing solicitations for task orders and making award of task orders under the MATOC and to have USACE reopen the competitive bid process on the grounds that the agency failed to properly conduct the procurement.  In the alternative, Al Andalus seeks an award of bid and proposal costs, as well as attorney's fees and costs.

For the reasons set forth below, the plaintiff's motion for judgment on the administrative record is **DENIED**, and the defendant's motion for judgment on the administrative record is **GRANTED**.

## I.   BACKGROUND FACTS

The following background facts are taken from the pleadings.  The facts below are undisputed unless otherwise noted.

### A.   The Solicitation

On May 13, 2008, USACE issued solicitation No. W917BG-08-R-0044 ("the solicitation") inviting offerors to compete for award of up to five individual IDIQ MATOC contracts for "miscellaneous construction projects within the boundary of Baghdad, Iraq."[1]  AR 160.  The proposed period of performance was for one base year,

---

[1]The actual language of the solicitation reads, "The Government intends to award up to a minimum of FIVE (5) individual MATOC contracts providing sufficient qualified and

plus two one-year option periods.  Id.  The maximum value for all contracts combined,

including for base and option years, was $450,000,000.  Id.  Each individual task order

issued under the MATOC was to range from a minimum of $5,000,000 to a maximum of

$20,000,000.  AR 162.

The procurement covers a range of miscellaneous design-build and construction-

related requirements in Baghdad, Iraq, including "projects inside and outside the

boundaries of existing Multi-National Bases."  AR 186.  The solicitation cautioned that

"[s]ectarian violence in Iraq is commonplace.  The work to be performed in this

solicitation is located in a predominately Shi'a neighborhood."  Id.

The solicitation stated that award of the IDIQ contracts will be made using a "best

value" approach.  AR 188.  The solicitation defines "best value" as "the most

advantageous offer, based on their Technical Proposal, with low past performance risk and

fair and reasonable pricing."  AR 188 (emphasis added).

Al Andalus timely submitted its proposal.  AR 143.  Al Andalus provided

information regarding its technical capabilities, construction experience, and past

performance in Volume A of its proposal.  AR 1424-74.  Volume A of Al Andalus's

proposal consisted of a cover page and fifty pages of substantive material.  Id.  Al Andalus

---

responsible contractors present offers."  Administrative Record ("AR") 160 (emphasis added).
The court acknowledges that the phrase "up to a minimum of" is unclear, but based on language
contained elsewhere in the solicitation, interprets this to mean "up to five."  See, e.g., AR 162
("The procurement consists of one solicitation with the intent to award up to five . . . IDIQ
Contracts. . . ." (emphasis added and internal parentheses removed)).  In any event, the court
finds that this language, although awkward, does not affect the outcome of this case.

also submitted 278 pages of drawings outside of Volume A because it did not have enough

room under the fifty-page limit to include these in Volume A itself.  See AR 3329-3607

(Al Andalus's drawings); AR 1466 (Al Andalus stated, "In reference to the sample project,

we have attached in a separate form a [sic] preliminary (35%) construction design

drawings and specifications as VOLUME A dose [sic] not fit for." (emphasis added)).

Proposed pricing was provided for the items contained in the Bill of Quantities ("BOQ")

in Volume B of Al Andalus's proposal.  AR 1475-96.

USACE received twenty-seven offers in response to the solicitation.  Three of the

proposals were received late (and therefore not evaluated), and seven of the proposals

were excluded from further consideration upon completion of the Contract Specialist's

initial compliance review for noncompliance with the solicitation's instructions.  AR 1689.

Thus, seventeen proposals were evaluated by a USACE Source Selection Evaluation

Board ("SSEB") for award under the MATOC contract.  AR 1690.  Following the SSEB's

review, the Source Selection Authority ("SSA") identified certain concerns, which led to

additional review by the SSEB.  After the SSEB's second review, the SSA considered the

SSEB's final report and made a final decision.  AR 1707.  The SSA made awards to

Offerors 2, 3, 10, 14, and 24 (collectively, "the awardees"), but not to the plaintiff.  Al

Andulus was not considered for an award, because following a review of its technical

proposal, Al Andalus received only mediocre ratings on the non-price evaluation factors,

including a rating of "Adequate - Moderate Risk" for past performance.  As a

4

consequence, Al Andalus did not meet the requisite "low performance risk" rating

required for "best value" consideration under the solicitation.

### 1.      Non-Price Evaluation Factors

Three technical factors were identified as comprising the "non-price evaluation

factors": past performance, construction experience, and technical capability.  AR 188.

The solicitation stated that the three non-price evaluation factors were of equal importance

and when combined, were to be "significantly more important than price."  Id.

### a.      Past Performance Factor

The solicitation provided that past performance would be evaluated based on the

following criteria: (1) timeliness - which required information to show that the offeror met

or exceeded contract schedules; (2) problem resolution - which required information on

prior projects to show that prior customers were satisfied with the offeror's resolution of

construction problems "with regard to minimizing cost and other field associated

problems," AR 193; (3) quality of product and services - which required information on

the offeror's demonstrated compliance with quality control; (4) cooperative manner -

which required information on the offeror's cooperation in achieving customer goals; (5)

customer satisfaction - which required information regarding the satisfaction of prior

customers; and finally (6) safety - which required information regarding the offeror's

compliance with safety regulations.  AR 34.  Under the terms of the solicitation, the

offerors were instructed to provide a "Past Performance Project Sheet, Attachment B for

each of the projects listed on the Experience Sheet, Attachment A." AR 190. Attachment

B was designed as a summary sheet regarding each of the projects identified on

Attachment A. Offerors were also to provide Point of Contact ("POC") information for

each of the five projects they identified in the construction experience portion of their

proposals so that USACE could forward to the POCs the Past Performance Questionnaires

("PPQ") attached to the solicitation as Attachment C. Id. Paragraph 1.9.1 of the

solicitation, entitled "Attachment B," stated:

> The Offeror shall provide a PAST PERFORMANCE PROJECT SHEET,
> ATTACHMENT B for each of the projects listed on the EXPERIENCE
> SHEET, ATTACHMENT A.
>
> Failing to submit attachments or failing to complete properly[] may result in
> rejection of the offer without further evaluation. Therefore, Offerors are urged
> to follow instructions and speak with the Contracting Officer if instructions are
> not understood.

Id. (emphasis added).

Al Andalus concedes that it did not submit Attachment B worksheets for the

projects it identified in its Attachment A. See 2nd. Am. Compl. ¶ 38 ("Al Andalus did not

provide its past performance information via the Attachment B . . . forms that had been

included with the Solicitation."). Instead, Al Andalus attached a spreadsheet with

information regarding its past performance on 61 projects, only two of which were

included in Al Andalus's Attachment A submission. AR 1445-46. It is not disputed that

Al Andalus also failed to provide any information on problem recognition and corrective

action for the submitted projects, as required by the solicitation, other than to submit a

6

sample "Problem Resolution Request Form."  AR 1447-48.  As such, Al Andalus never submitted any information regarding its past experience vis-á-vis minimizing cost during construction as required by the solicitation.  AR 191.  Al Andalus did, however, attach several letters and certificates of commendation and recommendation it had received from satisfied clients on past projects.  AR 1449-56.

The SSEB received and reviewed five PPQs completed by government customers evaluating Al Andalus's performance on previous projects.  AR 1747, 2819-42.  Based on the PPQs and the information submitted by Al Andalus, the SSEB, for the past performance factor, evaluated Al Andalus as "Adequate - Moderate Risk" based on the assessment of one strength, one weakness, and one deficiency.  AR 1747-48.  Specifically, the SSEB assigned Al Andalus a strength (but not a significant strength) for having received an average rating of "very good" on five performance reviews for four of the projects submitted, with no ratings that were below "satisfactory."  AR 1747.  The SSEB also noted that "[e]valuations stated that a quality project was delivered."  Id.  However, the SSEB stated in its evaluation, "As these were all on VBC [("Victory Base Complex"[2])], this is not considered a significant strength."  Id.

The SSEB then assigned Al Andalus a weakness under the past performance factor because Al Andalus's proposal "did not provide information for problem recognition and corrective actions in submitted projects.  The offeror did not provide any information

---

[2]The Victory Base Complex is the main site for international forces in Baghdad, Iraq and is more secure than most areas in Baghdad.

regarding minimizing cost during construction." Id.

Finally, the SSEB assigned Al Andalus a deficiency under the past performance factor because the past performance section of Al Andalus's proposal "did not follow directions and provided a long list of completed projects with no Attachment B information." AR 1748.

Based on the findings of the SSEB, the SSA concluded:

> [Al Andalus ]received [a] rating[] of. . . . "Adequate -[]Moderate Risk" for Past Performance. . . . [T]he offeror submitted evidence that it received an average rating of "very good" for four project[s]. No ratings were below satisfactory. Evaluations stated that a quality project was delivered. However, all of the projects were on Victory Base Complex. The offeror did not provide information for problem recognition and corrective actions in submitted projects. The Offeror did not provide information regarding minimizing cost during construction. The [O]fferor failed [to] properly complete [A]ttachment B (reporting past performance). Instead, it provided a one[-]page cursory summary."

AR 1698-99.

### b.    The Construction Experience Factor

Under the terms of the solicitation, the evaluation of the construction experience factor was to be focused on "the relevancy of the Offeror's experience within the last three years." AR 189. The solicitation required offerors to submit information for no more than five projects using a construction experience worksheet, Attachment A, to demonstrate relevant design and construction experience within the past three years. Id. To be considered under the construction experience factor, projects were required to be at least 50% complete based on the current approved construction schedule. Projects closer to

8

physical completion would be considered more relevant by USACE.  Id.  The solicitation

did not expressly define relevant experience, but instead instructed offerors to provide

evidence of experience in designated construction categories.  For example, projects

demonstrating multiple trades were to be given a higher rating than those that

demonstrated one or two trades only.  AR 189-90.

Because the majority of projects to be awarded under the MATOC are anticipated

to be within the price range of $5,000,000 to $20,000,000, the solicitation provided that

offerors would be rated more favorably under the construction experience technical factor

if they identified projects they had performed that fell within that price range.  The

solicitation also advised that "[c]urrent and previous experience in Baghdad, Iraq will

receive a higher rating."  AR 190.

With respect to its construction experience, Al Andalus identified the following

five projects in Volume A of its proposal: (1) Contract No. W917BG-06-C-0019, dated

August 2006, MATOC for construction and construction-related projects in Central Iraq

and the Al Unbar Region, with a maximum potential value over three years of

$150,000,000; (2) Contract No. W917BG-07-C-0092, dated July 9, 2007, for the

construction of a Waste Water Treatment Plant at VBC in Baghdad, Iraq; (3) Contract No.

W917BG-07-C0130, dated August 2007, for construction of the VBC Boundary and Area

Lighting at Victory Base Complex in Baghdad, Iraq; (4) Contract No. W917BG-07-C-

0069, dated May 4, 2007, for construction of a Reverse Osmosis Water Purification Unit

("ROWPU") Facility at VBC, Baghdad, Iraq (the "ROWPU Contract"); and (5) Contract

No. W917BG-06-D-0019-0006, dated August 2007, for design and construction of Entry

Control Point ("ECP") 14 at VBC, Baghdad, Iraq (the "ECP 14 Contract").  AR 1433-36.

All five of the contracts identified by Al Andalus in the construction experience

portion of its proposal were USACE contracts, and Al Andalus provided USACE POCs

for each of the contracts.  In a box labeled "Final Invoiced Amount (or Amount Invoiced

to Date)," Al Andalus listed the value of the contracts.  While Al Andalus did not identify

any contract with a value exceeding $5,000,000, it is not disputed that under one of the

listed contracts, the ROWPU Contract, Al Andalus in fact received more than $5,000,000.

Although Al Andalus had claimed that it had received $4,287,235.00 under the ROWPU

contract in its proposal,  AR 1435, Al Andalus states in its second amended complaint that

subsequent amendments to the contract raised the value of the ROWPU Contract to

$5,990,642.  2nd. Am. Compl. ¶ 35 ("[$4,287,235] was the originally awarded amount of

the ROWPU Contract and did not include subsequent amendments that had raised the

value of the ROWPU Contract to $5,990,642[].").

For the construction experience factor, the SSEB gave Al Andalus an "Acceptable"

rating based on the assessment of three strengths, one weakness, and one significant

weakness.  AR 1747.  Specifically, the SSEB noted the following strengths: first, Al

Andalus "demonstrated experience in the construction of gates, physical barriers, guard

towers, and fencing with the submittal of [the ECP 14 Contract] . . . ."  Id.  Second, all of

Al Andalus's experience was with projects located in Baghdad. Although the SSEB assessed Al Andalus a strength for this, the SSEB did not consider it a <u>significant</u> strength because "[a]ll projects submitted for consideration . . . . are located on VBC." <u>Id.</u> Third, Al Andalus "submitted projects with overlapping construction dates, demonstrating their ability to manage construction project[s] concurrently." <u>Id.</u>

The SSEB assigned Al Andalus a weakness under construction experience because Al Andalus's proposal "did not include construction experience with roads, 3-5 story buildings and explosive storage bunkers." <u>Id.</u> Although Al Andalus does not dispute that its proposal demonstrated no experience with the construction of either three- to five-story buildings or explosive storage bunkers, Al Andalus asserts that the ECP 14 Contract involved experience with the construction of roads. 2nd. Am. Compl. ¶ 76. In response, the government asserts that this project involved "paving" of an entry control point, but not actual road construction as contemplated by the solicitation. Def.'s Reply at 34-35.

The SSEB also assigned Al Andalus a significant weakness based on the fact that Al Andalus's proposal "did not submit construction experience within the value of $5[000,000]-[$]20[000,000]. All projects submitted for evaluation were for projects with a construction value under $5[,000,000]." AR 1747. The SSEB took this information directly from Al Andalus's submission. AR 1433-36. As noted above, however, it is not disputed that Al Andalus was eventually paid more than $5,000,000 on the ROWPU Contract.

In the decision memorandum, the SSA stated with regard to construction experience:

> The offeror demonstrated experience in construction of gates, physical barriers, guard towers and fencing. All projects submitted for consideration are in Baghdad, however, all of the projects were on FOBs [("forward operating bases")].[3] The offeror did not submit construction experience with roads, 3-5 story buildings, and explosive storage bunkers. All five projects submitted were below the value of $5,000,000 identified in the RFP.

AR 1698.

### c.    Technical Capability Factor

Under the terms of the solicitation, the technical capability rating was to be based on five equally important subfactors: (1) management team; (2) design capability; (3) management approach; (4) local Iraqi development; and (5) security. AR 194. For the management team subfactor, offerors were instructed to identify by name and submit a resume for the following key personnel: (1) project manager; (2) site superintendent; (3) contractor quality control ("CQC") manager[4]; and (4) safety manager. Id. For the Design Capabilities subfactor, the solicitation advised offerors that the government was seeking a contractor that could demonstrate "the ability to analyze the requirements described in the Scope of Work and develop satisfactory preliminary (35%) construction design drawings

---

[3]FOBs are secured environments that generally offer a safer environment than that in which the construction projects would be executed under the MATOC at issue in this case. See, e.g., Richard Tomkins, FOBs the Closest Thing to Home in Iraq, Wash. Times, Mar. 26, 2008, at A15.

[4]The information Al Andalus provided about its proposed CQC manager is discussed infra.

and specifications." Id. Offerors were also required to demonstrate knowledge of and familiarity with appropriate international design standards. Id.

Al Andalus's technical proposal provided background on the company and described its technical approach and "Project Plan of Operations." The plaintiff's Project Plan of Operations described the company's "Management and Execution Plan" (¶ 2.0[5]), its mobilization plans ("Mobilization," ¶ 3.0), the size and breakdown of the projected workforce it would use to perform under the work required by the solicitation ("Manpower Requirement," ¶ 4.0), the procedures and sources it would use to procure necessary construction materials ("Material Procurement," ¶ 5.0), the types and amount of various plants and equipment owned by Al Andalus ("Plant & Equipment Requirement," ¶ 6.0), project financial and administrative requirements (¶¶ 7.0 and 8.0), site security plans and considerations ("Site Security," ¶ 9.0), and the company's language capabilities, including the fluency in English of many of the company's employees ("Communication Issues," ¶ 10.0). AR 1427-30.

Al Andalus stated in its proposal that it had 393 employees "available for this project." AR 1428. However, in paragraph 6 of its Local Iraqi Development Plan, Al Andalus stated: "Our planning department declared that if this contract [sic] awarded to our company [sic] expected workers in our company working for this project is expected to be more than 45, including engineers, foreman, drivers, skilled and unskilled workers,

---

[5]All paragraph references contained in this paragraph are to Al Andalus's Project Plan of Operations.

guards, our people in the office."  AR 1472 (emphasis added).

For the technical capability factor, the SSEB evaluated Al Andalus as "Acceptable," based on the assessment of one significant strength, two strengths, three weaknesses, and one significant weakness.  AR 1748.  Specifically, the SSEB assigned Al Andalus a significant strength under the technical capability factor because Al Andalus's proposal "provided an extensive amount of detail regarding the electrical and mechanical portion of the proposal.  [Al Andalus] provided a good design plan to include scheduling methodology, CQC plan, Safety plan, good design drawings, and electrical/mechanical discussions."  Id.

The SSEB assigned Al Andalus a strength under the technical capability factor because Al Andalus had proposed "a well conceived security plan, demonstrating their understanding of the hostile environment for the proposed project."  Id.  The SSEB assigned Al Andalus another strength under the technical capability factor because Al Andalus had "provided a detailed local Iraqi Development Plan."  Id.

Al Andalus's proposal was assigned a weakness under the technical capability factor based on its stated personnel levels.  As stated above, Al Andalus's proposal indicated that "more than 45" employees would be used for this project.  AR 1472.  The SSEB determined that "this level of manning is considered inadequate for a project of this size."  AR 1748.  Al Andalus asserts that the use of the phrase "more than 45" in Al Andalus's Local Iraqi Development Plan was the result of a typographical error, in that Al

14

Andalus intended to say "more than 450," given that the 393-employee count provided earlier in the proposal included only on-site workers and did not include administrative and office staff.  Ptf.'s Br. Supp. Mot. J.A.R. ("Ptf.'s Br.") at 31.

The SSEB also assigned the plaintiff a weakness under the technical capability factor on the grounds that Al Andalus "did not include information for Key Personnel to include past project location and value of construction."  AR 1748.

The third weakness identified in Al Andalus's proposal under the technical capability factor was that Al Andalus's proposal "did not address their ability to manage and deal with multiple projects at the same time.  They also did not show a process to minimize risk."  Id.

Finally, the SSEB assigned Al Andalus a significant weakness under the technical capability factor because "[t]he CQC Manager has no practical experience in construction; this would be the first construction project for the CQC Manager."  Id.  The CQC manager proposed by Al Andalus had passed USACE's CQC management course in Baghdad and was identified in Al Andalus's proposal as "[c]urrently" working in "quality control assurance."  AR 1465.

The SSA stated with regard to Al Andalus's technical capability that despite several strengths,

> the offeror's [C]QC manager has no practical experience in construction; this would be the first project the [C]QC manager would be responsible for.  [Al Andalus] did not include all of the required information for each key member of management, to include project value and location of the construction

15

project.  The offeror did not address its ability to manage and deal with multiple projects at the same time.  It also did not show a process to minimize risk.

AR 1698.

### 2.    Volume A Page Limit

Offerors were instructed to address all three non-price factors (construction experience, past performance, and technical capability) in Volume A of their proposals. AR 187.  Offerors were to include their price proposals in a separate volume (Volume B), and their completed Standard Form 1442, representations and certifications and various other administrative attachments in a third volume (Volume C).  Id.

The government specified through two amendments to the solicitation that the offerors could not exceed fifty pages in the Volume A portion of their proposals.  AR 402, 410.  Specifically, Amendment 0002 to the solicitation contained the following question and response:

> Question 16: Is there a page limitation for Volume A which shall be comprised of Construction Experience, Past Performance, and Technical Capability?
>
> Answer/Response: Volume A shall not exceed 50 type written pages.  All pages shall be prepared on standard 8.5 x 11 inch paper (charts may be landscaped) and shall be in a legible font size (10).  All pages of each proposal shall be appropriately numbered and identified with the solicitation number.

AR 402 (emphasis added).

Amendment 0003 to the solicitation addressed another question from an offeror regarding the page limitations for Volume A and provided additional clarification,

emphasizing that the fifty-page limit included any attachments to Volume A:

> Question 40:  Do the Attachments A&B (Factors 1 and 2)
> count toward the 50[-]page limit?
>
> Answer/Response:  Yes.  Volume A shall not exceed 50 pages.

AR 410 (emphasis added).

In response to the solicitation, Al Andalus submitted a proposal containing, inter alia, a section entitled "Volume A Technical Proposal" that was fifty pages in length.  AR 1424-74.  Within the Volume A Technical Proposal, in a section entitled "Factor 3 Technical Capability," see AR 1459, Al Andalus included a subsection entitled "Design Capabilities," to address that evaluation subfactor.  AR 1466; see AR 194 ¶1.11.2.  In its Design Capabilities subsection, Al Andalus did not include drawings, but referred to them, as follows:

> In reference to the sample project, we have attached in a separate form a [sic]
> preliminary (35%) construction design drawings and specifications as
> VOLUME A dose [sic] not fit for.

AR 1466 (emphasis added).  To demonstrate its design capabilities, Al Andalus submitted approximately 278 pages of drawings and schematics in five separate binders.  AR 3329-3607.

Offeror 14, an awardee, submitted a Volume A technical proposal that was 165 pages long and also included eighteen pages of drawings and schematics in a subsection entitled "Attachment B, Design."  AR 1091-1248 (Offeror 14's Volume A), 1249-66 (Offeror 14's drawings).  Apparently, Al Andalus and Offeror 24 were the only offerors to

17

exceed the page limitations set for Attachment A, and the SSEB considered both proposals.

### 3.       The Price Reasonableness Determination

The solicitation advised that USACE would evaluate the price proposals to determine if the prices submitted for the sample project defined in the solicitation and in the BOQ were fair and reasonable, using the cost or price analysis techniques described in Federal Acquisitions Regulations ("FAR") 15.305(a)(1) and (4), 48 C.F.R. §§ 15.305(a)(1) & (4) (2005).  AR 197.  The solicitation provided that:

> For cost (Price) to be reasonable, it must represent a cost (Price) that provides best value to the Government when consideration is given to prices in the market, (market conditions may be evidenced by other competitive proposals), technical and functional capabilities of the offeror. . . . Price Proposals unrealistically high or low in price, when compared to the Government estimate, and market conditions evidenced by other competitive proposals received, may be indicative of an inherent lack of understanding of the solicitation requirements and may result in the proposal being rated lower or considered unacceptable.

Id.

USACE's technical experts prepared an Independent Government Estimate ("IGE") for the scope of work called for under the solicitation, namely, the BOQ for the Explosive Ordnance Disposal ("EOD") projects.  AR 439-60.  The IGE was approved by the agency's Chief of Construction Services on June 21, 2008.  AR 439.

The IGE estimated the reasonable cost of the EOD project called for under the solicitation to be $12,595,840.  Id.  The IGE contained twenty-one pages of documentation

to support the $12,595,840 estimate, with an estimated value for each of the various subtotal categories in the Estimated BOQ.  AR 440-59.  The June 21, 2008 IGE estimated the reasonable cost to mobilize, demobilize and provide security for the EOD Project as $225,000.  AR 440 (Line Item A-1).

The closing date for receipt of proposals was June 12, 2008.  AR 160.  Thus, the IGE was finalized nine days after the agency had received price proposals from all offerors indicating how they proposed to price the EOD Project.  AR 439.

B.     **The Final Source Selection Decision**

The source selection decision memorandum ("SSDM") summarized the adjectival ratings and price information for Al Andalus's proposal as follows:

| OFFEROR | PRICE | Construction Experience Rating | Technical Capability Rating | Past Performance Rating |
|---------|-------|-------------------------------|----------------------------|-------------------------|
| 23 [Al Andalus] | [redacted] | ACCEPTABLE | ACCEPTABLE | ADEQUATE-MODERATE RISK |

AR 1694.

In making a final decision, the SSA found that although Al Andalus presented "a very low price proposal," Al Andalus "merited low non-price ratings and these ratings weigh heavily against it."  AR 1699 (emphasis added).  As such, the SSA concluded, "I determined this offeror does not represent the Best Value to the Government."  Id. (emphasis added).

19

Based on this determination, the SSA assigned Al Andalus to a "first group" of nine offerors that all "received at least one non-price factor rating of less than 'Good,'" AR 1695, including for failure to achieve low past performance risk.  AR 1705 ("Each offeror in this group of nine received a past performance rating less favorable than 'Low Risk.'").  This group included Offerors 1, 4, 7, 9, 11, 12, 16, 20, and 23 (Al Andalus).  The SSA assigned to a "second group" the eight remaining offerors that "received ratings of 'Good' or higher on all non-price factors."  AR 1695.  This group included Offerors 2, 3, 10, 14, 18, 21, 22, and 24.  AR 1703.  The SSA conducted her price analysis and trade-off analysis with only this second group.

The SSA explained:

Adequate competition was obtained as a result of the solicitation, which is known as one of the best basis [sic] for price analysis and for establishing price reasonableness since all offerors submitted independent proposals to meet the same requirement during the same time period.  However, due to the wide variance in price proposals, as SSA I elected to compare the prices among the eight . . . highest rated (non-price ratings) offerors.

Id.

Based on that comparison, the SSA concluded that the average price of $18,240,978, which was the average of the eight top-rated offerors, "reflects current market conditions in Baghdad, Iraq."  AR 1704.  She rejected the IGE price of $12,595,849 on the grounds that it was unreliable.  Id.  More specifically, she explained that the IGE "was compiled using prices from past projects located in an area that is relatively safe to work in.  But the project the offerors priced is located in an area of

Baghdad with significantly greater security issues." Id.

After subjecting the members of the second group to a trade-off analysis, see AR 1703-06, the SSA selected the following five offerors for award of individual IDIQ contracts:

| OFFEROR | PRICE | Construction Experience Rating | Technical Capabilities Rating | Past Performance Rating |
|---------|-------|-------------------------------|-------------------------------|-------------------------|
| 3 | $13,838,609 | GOOD | GOOD | EXCELLENT |
| 10 | $13,985,213 | GOOD | GOOD | EXCELLENT |
| 2 | $17,190,073 | GOOD | GOOD | GOOD |
| 14 | $16,409,705.40 | GOOD | GOOD | GOOD |
| 24 | $19,420,164 | GOOD | OUTSTANDING | GOOD |

AR 1707.  The SSA specifically found that "[t]he government's stated goal of achieving low past performance risk is achieved through selection of Offerors 2, 3, 10, 14 and 24." AR 1706 (emphasis added); see also AR 188 ¶ 1.5.1.

By letter dated July 21, 2008, the Contracting Officer notified Al Andalus that it did not receive award of an IDIQ contract.  AR 2244-45.  By letters dated the same day, the Contracting Officer notified Offerors 2, 3, 10, 14, and 24 that they had been awarded IDIQ contracts pursuant to the solicitation.  AR 1751-55.[6]

---

[6]Al Andalus initially lodged a protest with the United States Government Accountability Office, which it withdrew on August 18, 2008.  AR 2268-69.

C.      The Present Litigation

Al Andalus filed its original complaint in this action on August 26, 2008.  It filed its

first amended complaint on October 24, 2008, and a second amended complaint on

November 7, 2008.  In this action, and in its cross-motion for judgment on the

administrative record, Al Andalus complains that the IDIQ awards must be set aside and

the competitive bidding process reopened for various reasons.

First, Al Andalus claims that USACE engaged in impermissible disparate treatment

by waiving the fifty-page limit for Volume A submissions for Offeror 14, one of the

awardees, while applying it to Al Andalus and other offerors.  As stated above, Al Andalus

does not deny that it submitted additional pages of drawings outside of its Attachment A

because its drawings would not fit within the allotted fifty pages.  Nonetheless, Al Andalus

claims it was prejudiced by the waiver for Offeror 14, on the grounds that Al Andalus was

criticized for not providing sufficient information on other matters within its proposal.

Second, Al Andalus claims that the SSEB's assignment of a consensus rating of

"Adequate - Moderate Risk" under the past performance factor, and "Acceptable" for the

technical capability and construction experience categories is not supported by the record.

Al Andalus claims that all of its ratings should have been higher.  Al Andalus takes

particular issue with its past performance rating and claims that the SSEB should not have

assigned it a deficiency for failing to submit Attachment B because the SSEB had all of

the information it needed to make an assessment of Al Andalus's past performance from

the PPQs that were submitted and considered by the SSEB.  Al Andalus claims that if the

SSEB and the SSA had performed a proper analysis of the PPQs and its submission, Al

Andalus would have received a "low risk" rating and would have then been eligible for

consideration in the best value evaluation.  Al Andalus also challenges the SSEB's

assignment of a consensus rating of "Acceptable" for technical capability and for

construction experience.  Al Andalus complains that other offerors with similar proposals

were given higher ratings and that Al Andalus's own ratings should have been higher.  Al

Andalus also complains that the weakness determinations were not warranted.  For

example, Al Andalus contends that had the agency probed deeper into Al Andalus's

proposal, it would have determined that despite stating otherwise in the proposal, one of

the contracts Al Andalus listed in its proposal was valued at over $5,000,000 and that Al

Andalus had made a typographical error when it stated that it had identified "more than

45" people for work on the project.

     Third, Al Andalus claims that the Contracting Officer violated FAR 15.404-

1(b)(2)(I), 48 C.F.R. § 15.404-1(b)(2)(I) (2008), by including only the eight offerors with

the highest non-price ratings in the price reasonableness determination.  Al Andalus claims

that this provision requires a contracting officer to base the price reasonableness

determination on all submitted bids, not on a subset of them.  Al Andalus challenges the

SSA's decision to consider only those offerors who met the "low-risk" past performance

standard in its evaluation.   The government, in its response to Al Andalus's complaint and

motion for judgment on the administrative record, argues that the SSA's decision is

supported by the administrative record.  The government contends that Al Andalus was

properly excluded from the best value consideration based on the weakness and deficiency

Al Andalus earned for its past performance.  The government argues that because Al

Andalus failed to meet the threshold criteria for award consideration, Al Andalus was not

eligible for award and was therefore not prejudiced by any of the alleged errors it has

identified in the procurement process.  The government further argues that Al Andalus was

not prejudiced by the government's decision to consider proposals in excess of the fifty-

page Volume A limit on the grounds that Al Andalus also exceeded the page limit by

submitting numerous pages of drawings.  Finally, the government contends that the SSA

conducted a proper price reasonableness evaluation when she elected not to consider the

nine offerors with unacceptably low non-price ratings.

Briefing was completed on January 13, 2009, and oral argument on the cross-

motions was heard on January 14, 2009.

## II.     STANDARD OF REVIEW

The United States Court of Federal Claims has jurisdiction to adjudicate pre-

and post-award bid protest claims pursuant to the Tucker Act, 28 U.S.C. § 1491(b) (2000),

which provides this court with

> jurisdiction to render judgment on an action by an interested party objecting to
> a solicitation by a Federal agency for bids or proposals for a proposed contract
> or to a proposed award or the award of a contract or any alleged violation of
> statute or regulation in connection with a procurement or a proposed

24

procurement[,] . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1); see also, e.g., Impresa Construzioni Geom. Domenici Garufi v. United States, 238 F.3d 1324, 1330 (Fed. Cir. 2001).[7]  The Federal Circuit has held that "the proper standard to be applied in bid protest cases is provided by [the Administrative Procedure Act ('APA'),] 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States (Banknote), 365 F.3d 1345, 1350-51 (Fed. Cir. 2004)  (quoting 5 U.S.C. § 706(2)(A); citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)); 28 U.S.C. § 1491(b)(4) (2000); see also Int'l Res. Recovery, Inc. v. United States, 60 Fed. Cl. 428, 431 (2004) ("'While a disappointed bidder does not have the right to have a federal court substitute its judgment for that of the administrative agency, the bidder does have the right to introduce appropriate evidence to allow the court to determine whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

_____

[7]Because Al Andalus is an Iraqi company, the court has given due consideration to the jurisdictional requirement of the Reciprocity Act, 28 U.S.C. § 2502 (1992), which states, in pertinent part:

> (a) Citizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts may sue the United States in the United States Court of Federal Claims if the subject matter of the suit is otherwise within such court's jurisdiction.

The court finds that this statute does not deprive it of jurisdiction as U.S. citizens are accorded the right to pursue claims against the Iraqi government in Iraqi courts.

25

with law.'" (quoting GraphicData, LLC v. United States, 37 Fed. Cl. 771, 780 (1997))).

Under the APA standards, a procurement decision "may be set aside if either: (1) the

procurement official's decision lacked a rational basis; or (2) the procurement procedure

involved a violation of regulation or procedure." Impresa, 238 F.3d at 1332. If the

challenge is "based on alleged violations of 'regulation or procedure,' a claimant must

show 'a clear and prejudicial violation of applicable statutes or regulations.'" Galen Med.

Assocs. v. United States, 369 F.3d 1324, 1331 (Fed. Cir. 2004) (quoting Banknote, 365

F.3d at 1351). To establish prejudice, a protester "must show that there was a 'substantial

chance' it would have received the contract award but for the errors" alleged. Bannum,

Inc. v. United States, 404 F.3d 1346, 1353 (Fed. Cir. 2005) (citing Info. Tech. &

Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003); Alfa Laval

Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

## III.   DISCUSSION

### A.     Al Andalus's Past Performance Rating Is Supported by the Administrative Record and Precludes a Finding of Prejudice.

The plaintiff alleges that the SSEB erred in assigning Al Andalus an adjectival

rating of "Adequate - Moderate Risk" for the past performance factor. Al Andalus takes

exception to the deficiency it was given by failing to include the Attachment B worksheets

for the projects it identified in Attachment A. Al Andalus also takes issue with the

weakness it was assigned for failing to provide information on problem recognition and

minimizing costs. Finally, Al Andalus argues that the SSEB gave certain other offerors

better ratings than are supported by the administrative record.  Each objection will be examined in turn.

First, with regard to the deficiency for failing to submit the Attachment B worksheets, Al Andalus argues that it should not have been downgraded for failing to follow the solicitation's instructions because the government was able to obtain enough information in the PPQs provided to the SSEB regarding Al Andalus's performance to make a decision.  Al Andalus contends that the omission was therefore "ministerial" and simply a "formatting" error.  Ptf.'s Reply at 16.  The government argues in response that the SSEB's decision to give Al Andalus a deficiency for failing to submit Attachment B worksheets was fully merited.

The court agrees with the government that the SSEB's deficiency rating was justified for several reasons.  First, there is no dispute that the Attachment B worksheets were required by the solicitation.  Indeed, as noted above, the language of the solicitation clearly emphasized the importance of these worksheets.  The solicitation expressly stated that the omission of Attachment B worksheets "may result in rejection of the offer without further evaluation."  AR 190.  In that same paragraph, the solicitation stated, "Offerors are urged to follow instructions and speak with the Contracting Officer if instructions are not understood."  Id.  In view of these statements in the solicitation, the requirement to include the Attachment B worksheets was not simply "ministerial."  Rather, Al Andalus failed to comply with an express solicitation requirement, which could have led to rejection of its

entire proposal.  As such, the court finds that the assignment of a deficiency for failing to include the Attachment B worksheets was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Impresa, 238 F.3d at 1332.

Second, contrary to Al Andalus's contentions, the PPQs were not by themselves enough to make up for Al Andalus's failure to comply with an express solicitation requirement.  Attachment B required Al Andalus to provide information regarding its own performance and experience.  The submitted PPQs, in contrast, are essentially check-off-the block score sheets; they did not provide any detail as to the work Al Andalus itself performed, the types of contracts used, and the current state of the projects.

The court also finds that the SSEB's decision to assign Al Andalus a weakness for failing to provide information on "problem recognition and corrective actions in submitted projects . . . . [as well as] information regarding minimizing cost during construction," was also fully justified by the evidence in the administrative record.  AR 1747.  Al Andalus admits that it did not submit the required information in its proposal.  Once again, it argues that the PPQs it submitted with its proposal were sufficient to make up for this deficiency. This assertion is not supported.  Under the solicitation, paragraph 1.9.4, "Problem Resolution," offerors were required to submit information "on problems encountered and corrective action taken, especially in regard to contract completion dates, quality control, and cost increases."  AR 191.  Al Andalus omitted any discussion of "problem resolution" in its proposal.  It did not include any narrative discussion of the issue to be addressed.

While it is true that the PPQs did not identify any specific problems, the PPQs were not intended to serve as the "narrative" for the "Problem Resolution" portion of the offer. Indeed, the PPQs were rated under a separate scoring category. PPQs were designed to address the issue of customer satisfaction, not problem resolution. The two issues are related but are not identical.

It is well-recognized that an agency's evaluation of past performance is entitled to great deference. See Westech Int'l, Inc. v. United States, 79 Fed. Cl. 272, 293 (2007) ("When the court considers a bid protest challenge to the past performance evaluation conducted by the agency, the 'greatest deference possible is given to the agency.'" (quoting Gulf Group Inc. v. United States, 61 Fed. Cl. 338, 351 (2004)); see also Overstreet Elec. Co. v. United States, 59 Fed. Cl. 99, 117 (2003) (stating that "when a procurement involves performance standards . . . a court must grant even more deference to the evaluator's decision[,] . . . a triple whammy of deference"). Where, as here, the offeror did not include a discussion called for in the solicitation, the agency's decision to assign Al Andalus a weakness for the past performance portion of its proposal was not arbitrary or capricious.

Under the adjectival rating system used in this solicitation, an "Adequate" rating means that "[s]ome doubt exists that the offeror will successfully perform the required effort based on their performance record." AR 1693. Given the support for the deficiency and weakness ratings assigned to Al Andalus for past performance, the court concludes

that the SSA's decision to give Al Andalus an overall "Adequate-Moderate Risk" rating

for past performance was not arbitrary, capricious or an abuse of discretion.  In such

circumstances, it is not necessary to address Al Andalus's contention that other offerors

(Offerors 2 and 14) should not have been given a better rating than Al Andalus in the past

performance category.  The court will not engage in a re-weighing of the various proposals

received.  Al Andalus's objections to the ratings for Offerors 2 and 14 go to the merits of

the SSEB's evaluation.  See Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384,

395 (2005) (challenges regarding "the minutiae of the procurement process in such matters

as technical ratings . . . involve discretionary determinations of procurement officials that a

court will not second guess." (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 449

(1996))).

   The SSA's evaluation required technical judgement and expertise that is entitled to

the greatest possible deference.  E.W. Bliss Co., 77 F.3d at 449.  In contrast, an evaluation

of Al Andalus's rating does not require the exercise of technical expertise.  Al Andalus

was given a lower past performance rating because it failed to follow instructions and

provide the information that was needed to fully evaluate its past performance.  The failure

to provide that information, by itself, justifies an "Adequate - Moderate Risk" rating.

Because Al Andalus was not entitled to a "Good - Low Risk" rating, it cannot show that it

had a substantial chance for award.  In such circumstances, Al Andalus cannot show it was

prejudiced by any errors in the SSA's evaluation of other offerors.  Bannum, 404 F.3d at

1353.

**B.    The Agency Did Not Err in Assigning Al Andalus an "Acceptable" Rating for Its Technical Capability.**

Having concluded that Al Andalus was not eligible to be considered for the best value evaluation because of its "Adequate-Moderate Risk" past performance rating, this court finds that Al Andalus cannot show prejudice based on the SSA's acceptance of the SSEB's "Acceptable" consensus rating of Al Andalus's technical capability.  In other words, even if Al Andalus had been given a better technical capability rating, it still would not have met the requisite low-risk past performance rating to be considered for award. Nonetheless, the court finds for the reasons set forth below that the government did not err in any event in assigning Al Andalus an adjectival rating of "Acceptable" for the technical capability factor.

First, the SSEB and SSA acted rationally in assigning Al Andalus a significant weakness based on its proposed CQC manager's lack of experience.  Al Andalus provided minimal information about the experience of its proposed CQC manager.  Al Andalus submitted a one page resume for the proposed CQC manager, [name redacted].  Half of the page was occupied by a reproduction of a certificate awarded to [name redacted] for completing "the Corps of Engineers Training Course [in] Construction Quality Mangement: CD-ROM."  AR 1465.  The second half of the page contains the following information about [name redacted]:

Personal Information

31

Full Name: [name redacted]
Date and location of birth: [redacted]
Residence address: [redacted]
Family status: [redacted]
Email: [redacted]
Tel No: [redacted]
Mobil [sic] No: [redacted]
Certification
1.
Bachelor degree [sic] (BA) for Information and computers [sic] engineering
from the University of Technology in Baghdad/Iraq. (2003-2007)
2.
English training certified by the IACCI. (3 months)
3.
USACE constructions [sic] quality management training course 2008.
Experience
Worked as IT at [A]l Andalus general contracting and trading company in
Baghdad for [t]he duration from [sic] January 2005 - 2008
Currently, quality control assurance.

Id.

While [name redacted]'s resume does show some <u>training</u> in construction, albeit

minimal, it was not arbitrary or capricious for the government to determine that he had "no

<u>practical experience</u> in construction" and that this would be his first construction project.

AR 1748 (emphasis added).  Although his resume does state "[c]urrently, quality control

assurance," apparently in reference to his current position with Al Andalus, this four-word

statement gives no indication that he has ever worked on a <u>construction</u> project.  AR 1465.

[Redacted]'s resume also states that he was employed by Al Andalus in another field,

information technology ("IT"), until the year Al Andalus bid on this contract, a fact that

supports the agency's conclusion that [name redacted] was not sufficiently experienced in

construction.  Taking into account [name redacted]'s lack of demonstrated work

experience and his training and background, including the fact that his only degree is in

"[i]nformation and computers [sic] engineering," the agency's conclusion that he has no

practical construction experience is supported.  Id. (emphasis added).

Likewise, the plaintiff cannot demonstrate that the assignment of a weakness for

failing to include past project location and value of construction information for key

personnel was erroneous.  The solicitation clearly mandated the provision of this

information, and the plaintiff did not provide it.  See AR 194 (Solicitation ¶ 1.11.1 states,

"The description of [each key personnel member's] experience shall detail projects

successfully completed, to include the name of the project, location, monetary value, and

in what capacity the individual served on the project." (emphasis added)).  Regardless of

whether or not other offerors were properly rated for failing to include this information,

the agency acted well within its discretion in assigning the plaintiff a weakness for not

including it.

The plaintiff cannot show that the agency acted irrationally in assigning the plaintiff

a weakness for not "address[ing] their ability to manage and deal with multiple projects at

the same time" and not "show[ing] a process to minimize risk."  AR 1748.  While it is true

that the SSEB credited Al Andalus with a strength under the construction experience

factor for "submit[ting] projects with overlapping construction dates, demonstrating their

ability to manage construction project [sic] concurrently," AR 1747, the court agrees with

the government that submitting evidence of managing concurrent construction projects in the past did not satisfy the requirement of Solicitation ¶ 1.11.3 (a) to "Describe how Prime will administer and utilize resources to rapidly respond to and manage multiple, concurrent, dispersed projects within the Baghdad Province."  AR 194 (emphasis added). The solicitation required offerors to demonstrate how they would do so in the future, which requires a prospective plan, not simply evidence of achieving that goal in the past. Additionally, while Al Andalus briefly mentioned its intention to minimize risk in a section of its proposal entitled "Management Approach," the proposal did not show a process to minimize risk.  AR 1467.  Thus, the agency's assessment of a weakness for this omission under the technical capability factor was not irrational.

Finally, while the SSEB probably should have known that Al Andalus would be using significantly more than forty-five employees for this project, the plaintiff is unable to show that if this weakness had been deleted, it would have resulted in an overall "Good" rating for technical capability.  Although it was mentioned in the SSEB report, the SSA did not mention the staffing level issue in her SSDM, but noted that other problems with Al Andalus's technical capability were significant.  Thus, there is no reason to believe that Al Andalus was prejudiced by the weakness assigned due to the "forty-five employee" issue.  See Bannum, 404 F.3d at 1353.  Rather, given the record support for the other "weaknesses" in technical capability, Al Andalus cannot show that a rating of "Acceptable" for this factor was arbitrary or capricious.  Furthermore, as noted above, Al

Andalus cannot demonstrate that a higher technical capability rating would have led to a substantial chance of an award under the contract.

C.      **The Agency Did Not Err in Assigning Al Andalus an "Acceptable" Rating for Its Construction Experience**.

Because the court finds that the "past performance" rating was supported, Al Andalus cannot show that it was prejudiced by any error in the government's evaluation of its construction experience.  However, once again, the court finds that the government did not err in assigning Al Andalus an adjectival rating of "Acceptable" for the construction experience factor in any event.  First, the court finds that the SSEB committed no error in assigning Al Andalus a significant weakness for not submitting construction experience within the value of $5,000,000 to $20,000,000.  While the plaintiff advances several arguments as to why the SSEB should have known that the value of one of the five projects listed in Al Andalus's proposal exceeded $5,000,000, it is plain from the solicitation itself that the government did not have such a burden.  By its terms, the solicitation stated that all of the required information needed to be within the four corners of the proposal.  See AR 189, Para. 1.7.1 ("The Offeror shall submit all information requested on Attachment A.  Failing to submit this attachment or failing to complete the forms properly[] may result in rejecting the offer without further evaluation.").  Accordingly, Al Andalus cannot place responsibility for its error on the government.  Furthermore, even if the information regarding the ultimate payment to Al Andalus under the ROWPU Contract was over $5,000,000, this was the only contract that was in the

$5,000,000 to $20,000,000 range.  As such, the government could still have justified a
"significant weakness" finding.  Other offerors were given "weakness" ratings because
more than one but less than all of the five projects they identified did not exceed
$5,000,000 in value.  See AR 1722 and 1736.  Thus, based on the evidence in the
administrative record, Al Andalus's rating was within the bounds of the agency's
discretion.

This court also finds the assignment of a weakness for not submitting construction
experience with roads, three- to five-story buildings, and explosive storage bunkers was
rational.  While reasonable minds may differ as to whether construction and paving of an
entry control point constitutes "construction of roads," this court is required to determine
whether the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not
in accordance with law."  Impresa, 238 F.3d at 1332 (quoting 5 U.S.C. § 706(2)(A));
Banknote, 365 F.3d at 1350-51.  The court finds that the agency did not violate this highly
deferential standard by concluding that Al Andalus's ECP 14 Contract did not involve
road construction.  Furthermore, this court also notes that it is likely that Al Andalus
would still have received a weakness for construction experience even if the agency did
construe the entry control point project as involving road construction.  There is no dispute
that Al Andalus did not submit any evidence to show that it had constructed three- to five-
story buildings or an explosive storage bunker.  There is ample evidence in the
administrative record to show that Al Andalus still would have received this weakness

even if it had been credited for construction experience with roads.  For example, Offerors

1, 2, 9, 11, 22, and 24 received a weakness for failing to demonstrate only the ability to

construct explosive storage bunkers.  AR 1717, 1719, 1728, 1732, 1745, 1749.  Thus, the

weakness rating is rationally supported.

> **D.     Al Andalus Was Not Prejudiced by the Government's Consideration of
> Offeror 14's Technical Proposal.**

The government concedes that Offeror 14 submitted a Volume A proposal in excess

of fifty pages.  The government argues that Al Andalus was not prejudiced by

consideration of Offeror 14's proposal because Al Andalus also submitted a proposal in

excess of the page limits.  In particular, Al Andalus included 278 pages of drawings that

were considered by the SSEB in making its evaluation of Al Andalus's proposal.

Apparently, other offerors, including Offerors 10, 18, 21, and 24 also exceeded the fifty-

page limit but their proposals were considered nonetheless.

Because the government considered proposals in excess of the fifty-page limit, the

government contends that it should be deemed to have waived the fifty-page limit under

FAR 52.215-1(f)(3), 48 C.F.R. § 52.215-1(f)(3) (2004), which allows the government to

"waive informalities and minor irregularities in proposals received."  Al Andalus contends

that the government cannot simply "waive" the page limit, because the government's

actions resulted in unfair and unequal treatment of offerors in violation of FAR 1.602-2,

48 C.F.R. § 1.602-2 (2005).  Ptf.'s Br. at 11 ("[T]he agency violated [its] fundamental duty

[to treat offerors impartially, fairly, and equitably] . . . by waiving the [solicitation's] strict

page limit . . . for one of the successful offerors, but not for Al Andalus."). Al Andalus

disputes that its drawings should count toward the fifty-page limit. It also claims that it

was prejudiced by the government's failure to adhere to the limit, on the grounds that Al

Andalus was penalized for failing to follow instructions, whereas Offeror 14 was not. Al

Andalus argues that this is a "classic case" of disparate treatment, and therefore the

ultimate procurement decision lacks a rational basis. The plaintiff asserts:

> Allowing one offeror to overcome deficiencies in its proposal by exceeding the page limitations, while penalizing other offerors such as Al Andalus for adhering to the page limitations is a textbook example of impermissible disparate treatment. Indeed, this court has observed that "the agency's failure to follow the terms of its own [request for proposals] and selection of an offeror based upon different requirements than those imposed upon the . . . other offeror[s] are quintessential examples of conduct which lacks a rational basis."

Ptf.'s Br. at 12 (quoting Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 273 (2004)).

In response to Al Andalus's arguments, the government explains that Offeror 14

was, in fact, assigned a "weakness" for exceeding the fifty-page limit and therefore,

contrary to Al Andalus's contentions, Offeror 14 was penalized for exceeding the page

limit. Most importantly, the government contends that where, as here, Al Andalus also

exceeded the page limit, it cannot claim prejudice because it was not subject to disparate

treatment. According to the government, so long as every offeror with a proposal in

excess of fifty pages was considered, the government should be deemed to have waived

the requirement. See FAR 52.215-1(f).

The court agrees with the government that Al Andalus has not demonstrated any

prejudice by the government's decision to consider proposals, including Al Andalus's, which did not strictly conform to the fifty-page limit for Volume A. Al Andalus does not allege that its failure to include key information regarding its fatal past performance rating was due to the limitation of pages. There is no evidence to suggest that Al Andalus's decision not to include certain information called for in the solicitation was tied to the fifty-page limitation. Nor does Al Andalus contend that its "Acceptable" ratings for technical capability or construction experience were tied to problems in meeting any page limitation. To the contrary, Al Andalus explained that it included its drawings separately because of the fifty-page limit. As stated above, the government did not penalize Al Andalus for exceeding the fifty-page limit.

In such circumstances, the court agrees with the government that because all proposals in excess of fifty pages were considered, the requirement was waived. FAR 52.215-1(f). Moreover, Al Andalus has failed to show that it was prejudiced by the government's decision to consider proposals, including its own, that exceeded the Volume A fifty-page limit.

**E.     The SSA's Price and Trade-Off Analysis Was Rational.**

Finally, Al Andalus argues that the procurement should be set aside on the grounds that the SSA could not perform a rational price and trade-off analysis when she elected to consider only offerors that had received ratings of "Good" or above in her analysis. Al Andalus contends that the SSA's decision not to consider the lowest-rated

nine offerors in her price and trade-off analysis violated the regulatory requirements for

best value determinations under Army FAR Supplement 5515-101-1(a), 48 C.F.R. § 5115-

101-1(a) ("Tradeoff Process") (2007), which states:

> On most acquisitions, the tradeoff process will be most effective and will result
> in the best value to the Government.  Use this process when it is in the
> Government's best interest to consider award to other than the lowest price
> offeror.  Under this process, you evaluate both cost (or price) and non-cost
> factors and award the contract to the offeror proposing the combination of
> factors that represents the best value based on the evaluation criteria.  Inherent
> in this process is the necessity to make tradeoffs considering the non-cost
> strengths and weaknesses, risks, and the cost (or price) offered in each proposal.
> The SSA will select the successful offeror by considering these tradeoffs and
> applying his/her business judgment to determine the proposal that represents the
> best value.

The government argues in response that the SSA was not required to conduct a

price analysis for all seventeen evaluated proposals, where, as here, the SSA determined

that nine of the proposals did not meet the "low-risk" past performance threshold for

award.  The government contends that an agency's price analysis involves issues of

judgment and that it was not unreasonable or irrational for the SSA to conclude that she

could conduct an adequate price evaluation among the eight offerors that met the threshold

for award.  The government also contends that in such circumstances, Al Andalus's

objections to the trade-off analysis are irrelevant.  Because Al Andalus was not eligible for

award based on its technical proposal, the government argues that Al Andalus was not

prejudiced by the SSA's trade-off analysis.

The court agrees with the government that given the discretion granted to the SSA

to make a best price analysis and the facts of this case, it was rational for the SSA to limit

her price analysis to the eight offerors that would be eligible for award.  See Biospherics,

Inc. v. United States, 48 Fed. Cl. 1, 10 (2000) ("Absent clear evidence in the solicitation

itself, directing [an agency] to employ [] specific price criteria or methodology to evaluate

price, the court will not read into the solicitation a limitation on agency discretion.").

Given the number of proposals that met the technical low-risk past performance criteria, it

was perfectly reasonable for the SSA to limit her price and trade-off analysis to those eight

offerors.  The court also agrees that because Al Andalus did not meet the threshold criteria

for award based on its technical moderate-risk rating for past performance, it was not

prejudiced by the SSA's analysis of price or her trade-off analysis.  As such, Al Andalus's

objections to the SSA's analyses cannot serve as a basis for overturning the procurement

decision.  See Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o

prevail in a protest the protester must show not only a significant error in the procurement

process, but also that the error prejudiced it."); Statistica, Inc. v. Christopher, 102 F.3d

1577, 1581 (Fed. Cir. 1996) ("To establish competitive prejudice, a protester must

demonstrate that but for the alleged error, there was a substantial chance that it would

receive an award-that it was within the zone of active consideration." (quoting CACI,

Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983), (internal quotation

marks and brackets omitted))).

## CONCLUSION

For the foregoing reasons, the government's motion for judgment on the administrative record is **GRANTED**.  The plaintiff's motion for judgment on the administrative record is **DENIED**.  Accordingly, the clerk of the court is directed to enter judgment in favor of the government.  Each party is to bear its own costs.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge